# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF REICH, | 1:04cv05546 DLB |
|     Plaintiff, | |
| v. | FINDING OF FACT AND CONCLUSIONS OF LAW |
| CAVALRY INVESTMENTS, LLC, | |
|     Defendant. | |

## **PROCEDURAL BACKGROUND**

This matter came on for trial before the undersigned, sitting without a jury, on December 1, 2008, through December 4, 2008. The parties were unable to complete the trial within their time estimate and trial continued from January 7, 2009, through January 9, 2009, and February 26, 2009, through February 27, 2009.

On March 6, 2009, the parties filed a Stipulation and Order Regarding the Post-Trial Briefing Schedule and agreed that briefing would be concluded by June 12, 2009.

Subsequently, on March 19, 2009, Plaintiff Jeff Reich ("Plaintiff") filed a Motion to Shorten Time for a Petition for Submission of Further Evidence. The Court denied the request on March 30, 2009, and Plaintiff filed his Petition for Submission of Further Evidence on March 31, 2009. The Court vacated the May 1, 2009, hearing date and denied the petition on May 19, 2009.

On May 27, 2009, the parties stipulated to a further revision to the post-trial briefing schedule and agreed that closing briefs would be due on July 24, 2009. The Court approved this stipulation on May 29, 2009.

On August 3, 2009, the parties again stipulated to extend the briefing schedule, this time extending the date for closing briefs to September 4, 2009. The stipulation also set a briefing schedule for Defendant Calvary Investments, LLC's ("Defendant") Motion to Strike Plaintiff's Request to Move Exhibits 69 and/or 119 into Evidence and its Motion to Strike a Portion of Plaintiff's Closing Brief and Accompanying Appendix A, both of which were filed on July 23, 2009. The Court approved the stipulation on August 10, 2009.

On September 18, 2009, Defendant's motions were heard before the undersigned and this case was submitted for decision. The Court DENIES Plaintiff's Motion to Admit Exhibits 69 and 119 into Evidence. The Court GRANTS Defendant's Motion to Strike Appendix A to Plaintiff's Closing Brief.

Having heard the testimony and reviewed the exhibits received at trial,[1] and having read and considered the parties' post-trial briefs and Proposed Findings of Fact and Conclusions of Law, the Court renders the following Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

Plaintiff is a citizen of the State of California and resides in the County of Fresno. He is an attorney licensed to practice law in the State of California and practices within the State at The Reich Law Firm.

Defendant is, and at all relevant times was, a limited liability company existing under the laws of the State of Delaware, with a principal place of business in Hawthorne, New York. For purposes of jurisdiction, Defendant does business in the State of California.

---

[1] Due to the extended time between the taking of evidence at trial and the conclusion of post-trial briefing, it was also necessary to review the trial transcripts.

2

1  Defendant is a business that purchases delinquent credit accounts, mainly credit card
2  accounts, and pursues collection of the accounts for its own benefit.  In its regular course of
3  business, Defendant retains attorneys to represent it in collecting on these accounts.
4  On or about April 30, 1999, Plaintiff and Defendant entered into a written contingency
5  fee agreement (the "Contract"), pursuant to which Plaintiff would provide legal services on
6  Defendant's behalf in collections actions in California.  Trial Exhibit ("Trial Ex."), 10.
7  The Contract was drafted by Donald Strauch, Defendant's Executive Vice-President.
8  Trial Ex. 10.  Among other things, the Contract provided:

   1) Legal Fees/Costs

   REICH is entitled to 20.0% contingency fee on all funds REICH collected (sic) (whether litigated or not) on the assigned accounts with the exception of the recovery of costs.  Costs and disbursements are the sole responsibility of CILLC.

   2) Responsibilities

   CILLC will be responsible to supply adequate documentation to initiate suit and respond to any request by REICH within 48 hours.  REICH will be responsible to commence suit within 48 hours of receipt of a claim, acknowledge receipt of it in the same time frame, and proceed with all due hast at every juncture of the suit.  Once judgment is attained, all know assets will be attached promptly.  On any assets uncovered by CILLC subsequently, REICH will issue the appropriate execution(s) within 24 hours of its advice.

   3) Status Report

   REICH will provide a concise and accurate status report to CILLC on a monthly basis.  Furthermore, REICH shall provide information to CILLC on a daily basis as requested on individual files.

   A copy of any judgment secured will be forwarded to CILLC within 48 hours of its receipt.
   . . . .

   10) Termination

   This agreement may be terminated with 60 days notice to the other party.
   If CILLC terminates this agreement for cause due to substantial breach of this agreement, REICH will not be entitled to any further fees due thereunder.

25  The Contract was signed by Plaintiff and Mr. Strauch.
26  At the inception of the Contract, The Reich Law Firm was a small firm, consisting of
27  Plaintiff and four or five clerical and/or paralegal employees.  Consistent with the practice of
28  Defendant's predecessor, Zirmack Investments, LP, Defendant initially sent Plaintiff accounts at

3

an average rate of approximately 30 per month.  Beginning in August 2000, however, it substantially increased the number of accounts referred to Plaintiff.  Defendant sent 56 accounts in August, 423 in September, 162 in October, 80 in November and 104 in December.  To handle the increase in accounts, Plaintiff hired additional clerical help.

In 2001, the number of accounts referred to Plaintiff decreased dramatically.  Defendant sent 6 accounts in January, 5 in February, 6 in March, 2 in April, and 22 in May.  After May 2001, Defendant did not send any additional accounts to Plaintiff.  Trial Ex. 109.  Accounts referred after April 1, 2001, were subsequently withdrawn.  Trial Ex. L.

In the summer of 2000, Defendant assigned Greg Caponetto as the account representative to oversee the accounts referred to Plaintiff and others firms.  Mr. Caponetto became concerned about the timeliness of Plaintiff's performance and/or his reporting on Defendant's accounts.  In September 2001, Mr. Caponetto went to The Reich Law Firm to audit Defendant's accounts.  Subsequent to Mr. Caponetto's audit, Defendant issued standards for performance on its accounts, applicable to all law firms handling its accounts.  These standards set time intervals for the various stages in processing accounts to judgment and collecting on those judgments.  Trial Ex. 36.

Prior to the September 2001 audit, other issues also caused conflict between the parties.  In January 2001, the parties disagreed on the application of the Delaware statute of limitations.  Plaintiff believed that the three year Delaware statute of limitations, rather than the four year California statute, was applicable in a number of Defendant's accounts in a portfolio of Citibank credit card accounts.  Trial Ex. 20.  Defendant, disagreeing with Plaintiff's position, withdrew the Citibank credit card accounts and referred them to other firms for collection.  It is unnecessary to resolve the question of whether Plaintiff correctly interpreted the choice of law issue regarding the statute of limitations.  Defendant does not assert that his position on the choice of law was cause for termination.

Also in January 2001, the parties disagreed on the issue of remote access to Plaintiff's database.  Defendant offered to increase the contingency rate from 20 percent to 25 percent if Plaintiff agreed to provide Defendant remote access.  Trial Ex. 19.  The parties failed, however,

to reach a mutually agreeable means for Defendant to remotely access Plaintiff's database of information regarding its cases. Again, it is unnecessary to assign fault for this failure because it is not a basis for termination with cause. Nonetheless, it appears to have been a point of dissatisfaction since other firms retained by Defendant provided such access.

The parties also disagreed as to the priority which should be given to the reimbursement of costs advanced by Defendant. In April 2001, Defendant directed Plaintiff, as well as other firms handling its accounts, to remit costs advanced by Defendant from the first funds collected on its accounts. Trial Ex. J. Plaintiff's refusal to accept this change led to Defendant's withdrawal of all accounts referred to him after April 1, 2001. Trial Ex. K, L.

In May and June 2001, Mr. Strauch made additional inquiries concerning specific accounts and received responses which he considered to be unsatisfactory. Trial Ex. 27, 32.

The relationship between the parties continued to deteriorate, as evidenced by a memo from Plaintiff to Mr. Strauch dated August 21, 2001. The memo put Defendant on notice that Plaintiff believed that he would be entitled to fees on any accounts which Defendant might withdraw from his office. Trial Ex. 34.

Finally, on April 22, 2002, after less than three years, Mr. Strauch terminated the Contract effective June 22, 2002, and withdrew all open accounts (approximately 454 accounts) as of the termination date. Trial Ex. 38. Defendant entered into a new agreement with different law firms to pursue collection of the withdrawn accounts. A majority of the accounts were transferred to The Winn Law Group (Winn).

At the time of transfer, Plaintiff had obtained judgments in at least 371 of the 454 transferred accounts, and an additional 30 accounts appear to have had stipulations for entry of judgment. The total amount of the judgments on the transferred accounts is $3,475,668.49. Trial Ex. KK. As of the last day of trial, $2,287,057 had been collected on the transferred accounts, and of that total, $257,057.55 was collected by Plaintiff. Trial Ex. KK.

Plaintiff performed only minimal work on the cases transferred to Eskanos & Adler.

## THE PARTIES' CONTENTIONS

This action results from Plaintiff's contention that he is owed additional compensation for work done on Defendant's behalf prior to the termination of the Contract.  Plaintiff contends that his work on the 454 transferred accounts conferred substantial benefit on Defendant for which he is entitled to compensation on a theory of quantum meruit.  Plaintiff claims, however, that a large percentage of what has been collected since transfer of those accounts was a direct result of judgments and abstracts of judgment he obtained prior to transfer.  Plaintiff maintains that he is entitled to compensation at the Contract rate, arguing that the Contract rate is the reasonable rate for quantum meruit.

Defendant maintains that Plaintiff substantially breached the Contract and is not entitled to any additional compensation.  Defendant relies on the provision in the Contract which provides, "[i]f CILLC terminates this agreement for cause due to substantial breach of the agreement, REICH will not be entitled to any further fees due thereunder."  Trial Ex.10.

## CONCLUSIONS OF LAW

A.      Defendant Has Not Proven a Substantial Breach of the Contract

To prevail on its affirmative defense that Plaintiff was terminated for cause and is therefore not entitled to further fees, Defendant must prove, by a preponderance of the evidence, a substantial breach of the Contract.  While the term is not defined in the Contract, a substantial breach is something more than just a failure to follow certain Contract provisions.  Rather, a substantial breach must materially affect Defendant's rights in some respect.  Here, Defendant may have been justifiably dissatisfied with Plaintiff's performance, but it cannot show, by a preponderance of the evidence, that his actions resulted in a concrete loss.

Although the April 2002 termination states that termination was a "direct result of various and far too numerous substantial beaches by The Reich Law Firm in the performance of its requisite obligations" under the Contract, it does not further specify the nature of the breaches. Trial Ex. 38.  In fact, there was no written communication between the parties, prior to the filing of this lawsuit, that set out the specific alleged substantial breaches.

During trial, Mr. Strauch testified that Plaintiff substantially breached the agreement by (1) failing to act timely once accounts were referred to him, resulting in debtors disposing of, or depleting, assets before a judgment could be obtained; (2) failing to file the complaints in several cases before the statute of limitations passed, even though the accounts were referred prior to the expiration of the limitations period; (3) filing at least one action beyond the statute of limitations and pursuing a collection on a confirmed case of identity theft, thereby exposing Defendant to damages under the Fair Debt Collection Practices Act; and (4) failing to timely and/or satisfactorily respond to Defendant's inquires about accounts and failing to provide required account status reports. Trial Transcript ("Trial Tr."), 1522; Trial Ex. 105. Mr. Strauch further testified that he raised these issues in conversations with Plaintiff. Trial Tr. 1526.

While Mr. Strauch's testimony clearly expresses the reasons for his dissatisfaction with Plaintiff, it fails to demonstrate by a preponderance of the evidence that Plaintiff substantially breached the Contract.

For example, Defendant contends that Plaintiff failed to act timely, but it was not clear exactly what was required of Plaintiff. The Contact directed Plaintiff to "proceed with all due haste at every juncture of the suit," and did not set forth specific guidelines. Trial Ex. 10. The communications between the parties also failed to clarify how an action should proceed. Although Mr. Caponetto devised time guidelines in October 2001, the testimony at trial demonstrated that there were numerous issues that could arise and prevent an action from proceeding under these guidelines. Trial Ex. 36. The majority of Defendant's allegations of untimeliness are vague and generalized.

Defendant has also failed to prove any damage resulting from these instances. Whether a collection would have been successful on one, or any, of the accounts is subject to speculation and has not been proven by a preponderance of the evidence.

For example, although Mr. Strauch testified "we've taken on huge losses because of his (Reich's) inappropriate actions," he also testified,

> [w]ell, you can't come to a specific amount. I can show you cases where they didn't do things timely. And, for example, the house was sold. We would have gotten paid on that. They didn't issue another account, I believe in the past I

7

testified about, that there was money in the bank account. It took them six or eight months later to hit it, and at that time, there was no money in the bank account. It's very difficult to come up with unknowns because you don't always get the information. But it's my opinion that it's so important to be expeditious in these matters and be there first because these are not people with a tremendous amount of money.

Trial Tr. 1521-1522.

Mr. Strauch's testimony is either generalized or speculative, and is insufficient to demonstrate any loss caused by Plaintiff's actions.

Defendant's citation to the statute of limitations issue also fails to demonstrate a substantial breach. Insofar as Defendant points to the actions that Plaintiff failed to file prior to the applicable statute of limitations, Defendant lists fewer than 20 actions out of a total of more than 450 actions.[2]  Trial Ex. MM.

Finally, Plaintiff's alleged failure to provide status reports also fails to demonstrate a substantial breach. Section 3 of the Contract requires Plaintiff to provide a "concise and accurate" status report to Defendant on a monthly basis, to provide information to Defendant on a daily basis "as requested on individual files," and to forward a copy of any judgments secured to Defendant within 48 hours of receipt. Trial Ex. 10. Again, it is not entirely clear what was required of Plaintiff based on the parties' subsequent conversations. Additionally, the testimony showed that Plaintiff did in fact provide timely status reports in some instances and in other instances, the reports were simply untimely. Even if Plaintiff did not provide *any* status reports, though, Defendant cannot point to any resulting loss. The evidence of damages is speculative, at best.

For the same reasons, Defendant has failed to show that it is entitled to any offset. First, Mr. Strauch testified that he could not quantify the loss. Additionally, Mr. Strauch's testimony about the 95 percent liquidation rate on cases referred to Plaintiff does not provide certainty to

---

[2] Defendant also raises an issue relating to Plaintiff's analysis of the application of the Delaware statute of limitations. It did not, however, cite this as a reason for the termination of the Contract. In any event, whether Plaintiff was correct in his opinion need not be resolved here. Not only were there just a few affected accounts, Trial Ex. LL, but Defendant was also able to recover on at least some of the accounts. Brian Winn, the attorney to whom the bulk of the withdrawn accounts were referred, disagreed with Plaintiff's analysis and filed some of the same actions that Plaintiff believed were barred by the Delaware statute.

8

proof of damages.  In calculating the 95 percentage rate, only cases in which judgment was obtained were included.  Also, the recovery amount used in the calculation includes interest, costs and some attorneys' fees, and compares the total to the overdue amount of the account. Trial Tr. 1435.  Hundreds of accounts referred to Plaintiff never resulted in any collection and there is no way to prove what, if anything, would have been collected in the handful of accounts identified by Defendant in its claim for damages.

B.      Even if Plaintiff Substantially Breached the Contract, He is Entitled to Recover

It is well settled in California that " an attorney discharged with or without cause is entitled to recover the reasonable value of his services rendered to the time of discharge." Fracasse v. Brent, 6 Cal.3d 784, 792 (1972).  "[T]he cause of action to recover compensation for services rendered under a contingent fee contract does not accrue until the occurrence of the stated contingency." Id.

If Defendant had met its burden of proving that the breaches cited by Mr. Strauch caused it damage, Plaintiff's recovery would have been reduced, but he would not be barred entirely from recovery in quantum meruit.

C.      Reasonable Value of Services Rendered

Plaintiff is therefore entitled to recover in quantum meruit for the value of services performed on Defendant's accounts to the extent his work conferred some benefit on Defendant. As the Contract was a contingency contract, Plaintiff may recover only to the extent that the contingency has occurred, i.e., to the extent that money has been collected on any account. Uncollected judgments do not entitle Plaintiff to any recovery.

Determining the reasonable value of Plaintiff's services cannot be done with a simple calculation or by totaling the number of hours worked on each case.  The testimony at trial demonstrates that the nature of collection cases renders it pure speculation to predict the outcome of any one action, or determine whether a successful outcome is easily obtained or is the result of many hours of attorney time.  Based upon the evidence presented at trial, it is impossible to determine with any reasonable certainty whether the successful outcome of an action was

primarily a result of Plaintiff's services or those of Mr. Winn.  However, it is clear that obtaining a judgment, which Plaintiff did in over 80 percent of the cases, conferred a benefit on Defendant.

It is most likely that in a majority of the actions where funds were collected, the collection was the result of both Plaintiff's services and those of Mr. Winn.  Again, however, the nature of these cases and the available information prevents a precise determination of which attorneys' efforts resulted in collection, and/or the percentage of the total efforts that should be attributed to either Plaintiff or Mr. Winn.

The testimony also revealed a disagreement as to whether pre-judgment or post-judgment activities were more complex and thus consumed more attorney time.  Consistent with their interests in the case, Plaintiff maintained that the pre-judgment phase was more complex, important and time consuming.  In contrast, Defendant and Mr. Winn maintained that most work was done in the post-judgment phase and simply obtaining a judgment was a routine effort.

In part, this disagreement is owing to a significant difference in the way the two attorneys approached collection actions.  Plaintiff testified that he spent more time during the pre-judgment stage of an action, and often pursued Court judgments, rather than Clerk's judgments, in order to include an award of attorneys' fees.  Mr. Winn testified that most of his work was performed during the collection phase, as he obtained Clerk's judgments through a routine and highly automated process set up in his office.  Mr. Winn further testified that he and his staff often searched for assets to levy against, while Plaintiff relied upon Defendant to identify assets.

A significant difference also existed in the attorneys' available resources.  Plaintiff was a sole practitioner with a few assistants.  In contrast, Mr. Winn's firm has a substantial collection practice that makes full use of modern office technology, i.e., state of the art Hubbard collection software.

In any event, the agreement between the parties in a contingency fee case is an appropriate starting point to determine the value of the services performed.  This is especially true here, where the cases are numerous, and the details regarding the value of the services performed in each individual action are difficult, if not impossible, to ferret out.  The Contract between the parties provided for a 20 percent contingency fee on collections, including attorneys'

fees, but excluding costs advanced by Defendant.  Similarly, Mr. Winn's contract with Defendant provided for a 20 percent fee on all collections on new referrals, after deducting costs advanced by Defendant.

The Court therefore finds that the reasonable value of the entirety of the services performed in each of the cases at issue here is 20 percent of the amount collected, after deducting costs advanced by Defendant.  Given the large number of cases involved, the lack of specific detail as to the operative reasons for collection and numerous other variables in each account, the Court finds that it is reasonable to award Plaintiff half of the 20 percent fee.  Therefore, the benefit of Plaintiff's work in the cases transferred to Mr. Winn is 10 percent of the amount collected by Mr. Winn, including attorneys' fees, after deduction of costs advanced (in those same cases) by Defendant.  Again, Plaintiff is only entitled to recovery to the extent that money was collected in the cases transferred to Mr. Winn.

Collections after the transfer of cases to Mr. Winn totaled $1,951,532.56.  Trial Ex. KK.  In the transferred cases in which there was a judgment, costs totaled $35,359,85.[3]  The difference is $1,916,172.71, and ten percent of that amount is $191,617.27.

Plaintiff is not entitled to any recovery for the minimal work he performed on the cases transferred to Eskanos & Adler.

**ORDER**

The Court therefore ORDERS that JUDGMENT be entered in favor of Plaintiff and against Defendant in the amount of $191,617.27.

IT IS SO ORDERED.

Dated:   **June 16, 2010**           **/s/ Dennis L. Beck**
                                      UNITED STATES MAGISTRATE JUDGE

---

[3] Costs were deducted only in cases where judgment was collected, and only to the extent the amount collected was equal to, or greater than, the costs.

11